UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

DAVID SERENA, RYAN GOMEZ,
CHRIS ROCHA, MANUEL
ESCAMILLA, CARMEN ALVAREZ AND
ALEJANDRA HERNANDEZ,

     NO. CIV. S-06-1262 FCD KJM

     Plaintiffs,

    v.            MEMORANDUM AND ORDER

STEPHEN L. MOCK, Presiding
Judge, Superior Court of Yolo
County, individually and in
his official capacity; THOMAS
WARRINER, Judge, Superior
Court of Yolo County,
individually and in his
official capacity; ROBIN
WEAVER, Yolo County Jury
Commissioner, individually
and in her official capacity,

     Defendants.

----oo0oo----

    This matter is before the court on plaintiffs' and
defendants' cross-motions for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure.  The court heard oral

1    argument on the motions on December 15, 2006.  For the reasons

2    set forth below, defendants' motion is GRANTED.

3                              **BACKGROUND**[1]

4         Plaintiffs brought this action, seeking declaratory and

5    injunctive relief for the alleged underrepresentation of Hispanic

6    individuals on the Yolo County Grand Jury.  (Pls.' 1st Am. Compl.

7    ("FAC"), filed June 30, 2006).  Plaintiff David Serena is the

8    former executive director of the Yolo County Housing Authority.

9    (PUF ¶ 47).  Serena and the housing authority had been the

10   subject of several grand jury investigations over many years.

11   (PUF ¶ 48).  Plaintiff Carmen Alvarez is Serena's wife, plaintiff

12   Alejandra Hernandez is Alvarez's daughter, and plaintiff Manuel

13   Escamilla is engaged to Serena's daughter.  (PUF ¶¶ 49-51).  None

14   of the plaintiffs in this case applied to serve on the Yolo

15   County Grand Jury.  (PUF ¶ 52).  Plaintiffs contend that Hispanic

16   individuals do not receive equal notice of the opportunity to

17   apply for grand jury service, to participate in the grand jury

18   selection process, to serve on the grand jury, and to serve as

19   foreperson on the grand jury.  (Id.)

20        The Superior Court's jury commissioner, defendant Robyn

21   Weaver, coordinates the recruitment process for the Yolo County

22   Grand Jury.  (PUF ¶ 4).  Jury recruitment is executed through a

23   variety of different means.  The jury commissioner sends a letter

24   to 52 different Yolo County community organizations, inviting

25   their members to apply for the grand jury.  (PUF ¶ 5).  A

26   _____

27        [1]    The facts are undisputed, except where otherwise noted.
     (See Pls.' Responses to Defs.' Stmt. of Undisp. Facts ("PUF"),
     filed Dec. 04, 2006; Defs.' Response to Pls.' Stmt. of Undisp.

28   Material Facts ("DUF"), filed Dec. 1, 2006).

pamphlet with information about the grand jury and an application for grand jury service, which can be photocopied and distributed to the organization's members, are enclosed with each letter. (PUF ¶ 5).  The 52 organizations include ethnic community groups and other organizations with varying political views and representing different occupations.  (PUF ¶¶ 6-7).  Each year, the jury commissioner issues a press release to local newspapers circulating in Yolo County, announcing that applicants are being solicited to serve on the Yolo County grand jury.  (PUF ¶ 8). Following publication of the press release, the jury commissioner typically received numerous phone calls from members of the public, requesting that an application for grand jury service be sent to them.  (PUF ¶ 10).  No invitations are sent to Spanish language newspapers or television stations.  (DUF ¶ 18).

Information about applying for the grand jury is also posted in two locations in the Superior Court's main jury room in the Woodland courthouse.  (PUF ¶ 16).  The postings indicate that anyone interested in serving on the grand jury should contact the jury commissioner for an application.  (PUF ¶ 17).  Each year, the Yolo County Grand Jury issues a final report that includes an introductory section discussing the purpose of the grand jury, the qualifications for grand jury service, and information on how to apply to the grand jury.  (PUF ¶ 25).  Copies of this report are available in the Yolo County public libraries.  (PUF ¶ 26). This report is also published, with the application information, in local Yolo County newspapers every year.  (PUF ¶ 27).  The Superior Court's website has a webpage dedicated to providing information on the qualifications for grand jury service and

information on how to apply; the website also allows a person to download and print an application.  (PUF ¶¶ 28-29).

The jury commissioner also sends an e-mail to the judges and commissioners of the Superior Court, asking that they provide the names of persons whom the judges believe would be interested in receiving a grand jury application.  (PUF ¶ 18).  The jury commissioner sends a letter to each member of the Yolo County Board of Supervisors, requesting that the supervisor provide the names of persons whom the supervisor believes would be interested in receiving a grand jury application.  (PUF ¶ 20).  The letter to the supervisors specifically asks that names be submitted with an eye toward diversity on the grand jury.  (PUF ¶ 21).  The individuals identified by the judges, commissioner, and supervisors are mailed a pamphlet describing the function of the grand jury and an application to serve on the grand jury.  (PUF ¶ 22).  The jury commissioner also identifies persons with ethnic-sounding last names, including Hispanic surnames, who have recently completed petit jury service and mails them a pamphlet and application.  (PUF ¶ 14).  Pamphlets and applications are also sent to former petit jurors who live in smaller towns and communities of Yolo County to gain geographic diversity.  (Decl. of Robyn Weaver in Supp. of Defs.' Mot. for Summ. J ("Weaver Decl."), filed Nov. 17, 2006, ¶ 7).  Over the past decade the Superior Court has mailed 1,444 grand jury applications to

///

///

///

///

4

1  individuals.  (PUF ¶ 31).  Of these 1,444 potential applicants,

2  25.1% were persons with Hispanic surnames.  (PUF ¶ 32).[2]

3        Yolo County grand jurors are selected from the individuals

4  who apply for grand jury service.  (PUF ¶ 33).  If a person

5  submitting an application indicates that he or she meets the

6  statutory requirements for service and indicates that he or she

7  has sufficient time necessary to serve on a grand jury, the

8  applicant is scheduled for an interview with a judge, or

9  occasionally a commissioner of the Superior Court.  (PUF ¶ 34).

10 Each judge, or occasionally a commissioner, will typically

11 interview two to three applicants.  (PUF ¶ 35).  Defendants

12 assert that the interviewing judge or commissioner determines

13 whether the applicant possesses the legal qualifications to serve

14 as a grand juror; the applicants found legally qualified to serve

15 are then listed on a public court order indicating that the

16 individuals listed are candidates for grand jury selection.  (PUF

17 ¶¶ 36-37).  Plaintiffs contend that not all legally qualified

18 applicants are listed as candidates.  (PUF ¶ 37).  Specifically,

19 plaintiffs assert that potential grand jurors have been

20 eliminated by judges at this stage of the process for reasons

21 such as: "a nice man, but fairly shy, a follower, not a leader";

22

23        [2]    Plaintiffs do not dispute these facts, but assert that
   37.3% of the mailing group for this years grand jury were
24 Hispanic, "thereby skewing the total statistics and attempting to
   give cover to a long-term system of under representation."  (PUF
25 ¶ 32).  Plaintiffs imply that defendants have manipulated the
   number of applications sent to Hispanics in response to the
26 current lawsuit.  Defendants assert that the applications were
   primarily mailed in April and May 2006, before plaintiffs filed
27 their suit in June.  (Defs.' Reply, filed Dec. 8, 2006, at 10).
   However, neither party presents admissible evidence to support
28 these assertions.

"nice lady, well-meaning, but no special expertise"; or simply perfunctorily rejected with no reason given by the judge on the interview form.  (PUF ¶ 36).

The Yolo County Grand Jury consists of 19 grand jurors and serves a one year term, generally beginning on July 1 and ending on June 30 of the following year.  (PUF ¶ 38).  The grand jury for each year comprises both new members and members who served on the grand jury in the preceding year.  (PUF ¶ 39).  In Yolo County, serving grand jurors may elect to serve on the succeeding grand jury ("holdovers") by indicating their interest to the Jury Commissioner.  (DUF ¶ 27).  Up to ten grand jurors serving on the current grand jury can be held over to serve an additional term on the next grand jury.  (Weaver Decl. ¶ 14).  The number of new grand jurors selected is 19 minus the number of holdover grand jurors.  (PUF ¶ 44).  The new grand jurors are randomly selected by having their names pulled from a wooden box with a lid (the "grand jury box").  (PUF ¶ 40).  The grand jury box contains the names of the candidates who were placed on the list after the interview with the judge or commissioner as well as the names of current alternate grand jurors who did not serve on the grand jury for the current year but are interested in serving during the upcoming year.  (PUF ¶ 41).  These names are written on a piece of paper which is folded in half and placed in the grand jury box.  (PUF ¶ 42).  The Clerk of the Superior Court pulls one name out of the grand jury box at a time until the grand jury panel of 19 is filled.  (PUF ¶ 43).  Thereafter, every remaining name in the grand jury box is pulled one at a time and each of ///

6

these persons is designated as an alternate grand juror. (PUF ¶ 45).

Both parties have retained experts in demography to opine regarding the representation of Hispanic individuals on the Yolo County Grand Jury in recent years. Plaintiffs' expert, John R. Weeks, Ph.D., presents evidence that between 1997 and 2006, the proportion of the jury-eligible population that is Hispanic is 15.4%. (Am. Decl. of John R. Weeks, Ph.D. ("2d Am. Weeks Decl."), filed Dec. 8, 2006, at 5). The proportion of Hispanic individuals in the grand jury pool is 8.9%. (Id.) Therefore, the absolute disparity over a ten year period is 6.5%. (Id.) Weeks also opines that "the most recent set of grand juries demonstrates large absolute disparities with respect to Hispanics." (Am. Decl. of John R. Weeks, filed Nov. 17, 2006 ("1st Am. Weeks Decl."), ¶ 6). Between 2004 and 2007, the proportion of the jury eligible population that is Hispanic is 17% and the proportion of Hispanic individuals in the grand jury pool is 3.5%. (2d Am. Weeks Decl., at 5). Therefore, the absolute disparity over the last three years is 13.5%. (Id.) Defendants' expert, Peter A. Morrison, Ph.D., presents evidence that between 1997 and 2006, the proportion of the jury-eligible population that is Hispanic is 14%, the proportion of Hispanic individuals initially selected as Grand Jurors is 10%, and that the absolute disparity over a ten year period is 4%. (Dep. of Peter Morrison, Ph.D. ("Morrison Dep."), Ex. 9, ¶ 12).[3]   For the

---

[3]   The Declaration of Peter Morrision, filed Nov. 17, 2006, provides that the proportion of Hispanic individuals
(continued...)

purposes of this motion, however, defendants do not dispute the

statistics presented by plaintiffs' expert.[4]

**STANDARD**

Summary judgment is appropriate when it is demonstrated that

there exists no genuine issue as to any material fact, and that

the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144,

157 (1970).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing
> the district court of the basis of its motion, and

---

[3](...continued)
initially selected as Grand Jurors is 10.5%, and therefore, the
absolute disparity is 3.5%. However, in their opposition,
defendants asserts that "after correction of a minor error," the
appropriate percentages are 10% and 4%, citing Ex. 9 to the
Deposition of Peter Morrison. (Defs.' Opp'n to Pls.' Mot. for
Summ. J. ("Defs.' Opp'n"), filed Dec. 1, 2006, at 3-4 n.2).

[4]    On the date of the hearing, plaintiffs filed a
declaration, informing the court that additional documents
relating to the recruitment and holdover process for the Yolo
County Grand Jury were turned over by defendants minutes before
the hearing. (Decl. of G. Whitney Leigh re. Defs.' Repeated
Discovery Violations ("Discovery Decl."), filed Dec. 15, 2006).
Plaintiffs' counsel was granted leave to file a motion based upon
defendants' untimely disclosure of these documents. On December
22, 2006, plaintiffs filed a submission, requesting the court to
consider documents from the newly disclosed evidence and giving
notice to the court and defendants that they would not be filing
any further motions. (Pls.' Submission, filed Dec. 22, 2006, at
2-3). The court has reviewed and considered plaintiffs'
submissions.

On December 28, 2006, defendants filed a response and
declaration, explaining that the untimely disclosure of the
documents was inadvertent. The court takes such discovery
conduct very seriously. Defendants have caused unnecessary delay
and inconvenience to plaintiffs and the court. However, there is
no evidence that this was a willful effort by defendants to
prevent discovery or to gain a tactical advantage. While the
court finds defense counsel's inadvertence highly disconcerting,
it does not rise to the level of sanctionable behavior.

identifying those portions of "the pleadings,
depositions, answers to interrogatories, and admissions
on file together with the affidavits, if any," which it
believes demonstrate the absence of a genuine issue of
material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the
nonmoving party will bear the burden of proof at trial on a
dispositive issue, a summary judgment motion may properly be made
in reliance solely on the 'pleadings, depositions, answers to
interrogatories, and admissions on file.'"  Id. at 324.  Indeed,
summary judgment should be entered against a party who fails to
make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party
will bear the burden of proof at trial.  Id. at 322.  In such a
circumstance, summary judgment should be granted, "so long as
whatever is before the district court demonstrates that the
standard for entry of summary judgment, as set forth in Rule
56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the
burden then shifts to the opposing party to establish that a
genuine issue as to any material fact actually does exist.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.
253, 288-289 (1968).  In attempting to establish the existence of
this factual dispute, the opposing party may not rely upon the
denials of its pleadings, but is required to tender evidence of
specific facts in the form of affidavits, and/or admissible
discovery material, in support of its contention that the dispute
exists.  Fed. R. Civ. P. 56(e).  The opposing party must
demonstrate that the fact in contention is material, i.e., a fact

9

1   that might affect the outcome of the suit under the governing

2   law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986),

3   and that the dispute is genuine, i.e., the evidence is such that

4   a reasonable jury could return a verdict for the nonmoving party,

5   <u>Id.</u> at 251-52.

6       In the endeavor to establish the existence of a factual

7   dispute, the opposing party need not establish a material issue

8   of fact conclusively in its favor.  It is sufficient that "the

9   claimed factual dispute be shown to require a jury or judge to

10  resolve the parties' differing versions of the truth at trial."

11  <u>First Nat'l Bank</u>, 391 U.S. at 289.  Thus, the "purpose of summary

12  judgment is to 'pierce the pleadings and to assess the proof in

13  order to see whether there is a genuine need for trial.'"

14  <u>Matsushita</u>, 475 U.S. at 587 (quoting Rule 56(e) advisory

15  committee's note on 1963 amendments).

16      In resolving the summary judgment motion, the court examines

17  the pleadings, depositions, answers to interrogatories, and

18  admissions on file, together with the affidavits, if any.  Rule

19  56(c); <u>SEC v. Seaboard Corp.</u>, 677 F.2d 1301, 1305-06 (9th Cir.

20  1982).  The evidence of the opposing party is to be believed, and

21  all reasonable inferences that may be drawn from the facts placed

22  before the court must be drawn in favor of the opposing party.

23  <u>Anderson</u>, 477 U.S. at 255.  Nevertheless, inferences are not

24  drawn out of the air, and it is the opposing party's obligation

25  to produce a factual predicate from which the inference may be

26  drawn.  <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224,

27  1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898 (9th Cir. 1987).

28  ///

1    Finally, to demonstrate a genuine issue, the opposing party

2  "must do more than simply show that there is some metaphysical

3  doubt as to the material facts. . . . Where the record taken as a

4  whole could not lead a rational trier of fact to find for the

5  nonmoving party, there is no 'genuine issue for trial.'"

6  Matsushita, 475 U.S. at 586-87, 106 S. Ct. at 1356.

7                              **ANALYSIS**

8  **A.    Standing**

9    The issue of standing is a threshold determination of

10 "whether the litigant is entitled to have the court decide the

11 merits of the dispute or of particular issues." Warth v. Seldin,

12 422 U.S. 490, 498 (1975); Steel Co. v. Citizens For A Better

13 Env't, 523 U.S. 83 (1998).  "The judicial power of the United

14 States defined by Art[icle] III is not an unconditioned authority

15 to determine the constitutionality of legislative or executive

16 acts." Valley Forge Christian Coll. v. Americans United For

17 Separation of Church and State, Inc., 454 U.S. 464, 471 (1982).

18 Rather, Article III limits "the federal judicial power 'to those

19 disputes which confine federal courts to a role consistent with a

20 system of separated powers and which are traditionally thought to

21 be capable of resolution through the judicial process.'" Id. at

22 472 (quoting Flast v. Cohen, 392 U.S. 83, 97 (1968)); Steele, 523

23 U.S. at 102.  "Those who do not possess Article III standing may

24 not litigate as suitors in the Courts of the United States." Id.

25 at 476.

26    The Supreme Court has set forth that "[t]he 'irreducible

27 constitutional minimum of standing' contains three requirements."

28 Steele, 523 U.S. at 102-03 (quoting Lujan v. Defenders of

11

1   <u>Wildlife</u>, 504 U.S. 555, 560 (1992)).  First, plaintiff must

2   allege an "injury in fact – a harm suffered by the plaintiff that

3   is concrete and actual or imminent, not conjectural, or

4   hypothetical."  <u>Id.</u> at 103 (internal quotations and citations

5   omitted).  A claim must be for an injury to the plaintiff's own

6   legal rights and interests, rather than the legal rights and

7   interests of third parties.  <u>Elk Grove Unified Sch. Dist v.</u>

8   <u>Newdow</u>, 542 U.S. 1, 12 (2004).  Second, plaintiff must allege

9   causation – "a fairly traceable connection between the

10  plaintiff's injury and the complained-of conduct of the

11  defendant."  <u>Steele</u>, 523 U.S. at 103 (citing <u>Simon v. E. Ky.</u>

12  <u>Welfare Rights Org.</u>, 426 U.S. 26, 41-42 (1976).  The injury must

13  not be the result of some third party not before the court.

14  <u>Lujan</u>, 504 U.S. at 560 (citing <u>Simon</u>, 426 U.S. at 41-42).  Third,

15  the injury must be redressable – there must be "a likelihood that

16  the requested relief will redress the alleged injury.  <u>Steele</u>,

17  523 U.S. at 103 (citing <u>Simon</u>, 426 U.S. at 45-46).

18      Defendants argue that since plaintiffs have not applied to

19  become Yolo County grand jurors or forepersons, they lack

20  standing to bring their claims that they have been systematically

21  excluded from the grand jury selection process.  The court

22  previously addressed this issue in its August 4, 2006 Memorandum

23  and Order, finding that plaintiffs had standing sufficient for

24  the pleading stage because plaintiffs had alleged that they had

25  been systemically excluded from the grand jury recruitment

26  process.  (Docket #33).  In order to claim redress for an injury

27  from this process, which occurs prior to the grand juror

28  ///

1 application and selection process, plaintiffs need not have

2 applied for grand jury service.

3      Defendants now contend that there is no evidence to support

4 plaintiffs' allegations of unequal notice in the recruitment

5 process.  This argument, however, asks the court to address the

6 merits of plaintiffs' claims.  It is undisputed that plaintiffs

7 are members of an identifiable group of individuals, Hispanics,

8 that are allegedly injured through underrepresentation on the

9 Yolo County grand jury.  Plaintiffs assert that such

10 underrepresentation results *inter alia* from unequal notice

11 procedures in the recruitment process.[5]  Therefore, on a motion

12 for summary judgment, plaintiffs have standing to assert claims

13 relating to alleged constitutional violations resulting from

14 defendants' recruitment procedures.[6]

15 ────────────────

16      [5]    Further, plaintiffs do present evidence, in the form of
the expert opinion of Michael N. Burt that the notice and
17 recruitment procedures employed by defendants leads to the
alleged under representation of Hispanic individuals on the Yolo
18 County Grand Jury.  (Decl. of Michael N. Burt, Esq. ("Burt
Decl."), filed Nov. 1, 2006, ¶¶ 6-10).  Burt asserts that he is
19 "familiar with the methods and practices used across the state of
California to populate grand juries due to [his] litigation
20 experience on this issue," and opines that the methods and
practices used to populate the Yolo County Grand Jury "are
21 leading to [] disparity" in the representation of Hispanic
individuals.  (Id. ¶¶ 6-7).  Burt also asserts that the evidence
22 he has reviewed "indicates that the Yolo County Grand Jury
Commissioner arbitrarily sends out emails and letter [sic] to
23 persons requesting if they have anyone to recommend for the Yolo
County Grand Jury." (Id. ¶ 9).  Burt opines that this method is
24 problematic in light of the fact that "[s]ince 1981, California
has mandated the use of two DMV and voter registration source
25 lists to be used by the courts in many districts." (Id. ¶ 10).
Based upon such evidence, there is a triable issue of fact
26 regarding whether the notice given to plaintiffs by defendants'
recruitment procedure was constitutionally sufficient.

27      [6]    Because of the court's ruling, *infra*, based upon the
28                                             (continued...)

13

**B.   Equal Protection Claim**

Plaintiffs assert that defendants have violated their right to equal protection through the systemic exclusion of Hispanic individuals from the Yolo County Grand Jury.  Courts have rarely had occasion to sanction lawsuits by persons claiming that they had been unconstitutionally excluded from grand jury service. See Quadra v. Superior Court of the City and County of San Francisco, 378 F. Supp. 605, 613 (N.D. Cal. 1974) (citing Carter v. Jury Commission of Greene County, 396 U.S. 320 , 329-30 (1970).  "The same standards apply, however, whether a person is claiming such exclusion from grand-jury service or whether one criminally accused challenges the grand jury that indicted him." Id. at 613-14 (citing Carter, 396 U.S. at 329 ("People excluded from juries because of their race are as much aggrieved as those indicted and tried by juries chosen under a system of racial exclusion.")).

In order to show that an equal protection violation has occurred in the context of the grand jury recruitment and selection process, the plaintiffs "must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." Castaneda v. Partida, 430 U.S. 482, 494 (1977).  The Supreme Court has

[6](...continued)
parties' evidence of the degree of representation, the court does not decide whether plaintiffs may assert a claim for alleged violations in other aspects of the Yolo County Grand Jury selection process.  The court also does not reach plaintiffs' alternative argument that plaintiff Serena has standing, separate and apart from the other plaintiffs, because he was investigated by the Yolo County Grand Jury and subsequently criminally indicted.

articulated a three-step process for establishing a prima facie
case in such an equal protection challenge.  Id.  First,
plaintiffs must establish that the group, of which plaintiffs are
members, "is one that is a recognizable, distinct class, singled
out for different treatment under the laws, as written or as
applied."  Id.  Second, "the degree of underrepresentation must
be proved, by comparing the proportion of the group in the total
population to the proportion called to serve as grand jurors,
over a significant period of time."  Id.  Third, plaintiffs must
present evidence of discriminatory intent.  Id.; United States v.
Esquivel, 88 F.3d 722, 725 (9th Cir. 1996).  A procedure that is
"susceptible of abuse or is not racially neutral supports the
presumption of discrimination raised by the statistical showing."
Id.; Esquivel, 88 F.3d at 725.  Once the plaintiff has shown
"substantial underrepresentation of his group, he has made out a
prima facie case of discriminatory purpose, and the burden then
shifts to the State to rebut that case."  Id.  "In order to rebut
the presumption of unconstitutional action, the state must show
'that permissible racially neutral selection criteria and
procedures have produced the monochromatic result.'"  Esquivel, 88
F.3d at 725 (quoting Castaneda, 430 U.S. at 494).

As an initial matter, the parties do not dispute that
Hispanic individuals are a distinctive, cognizable class for
purposes of this inquiry.  See Castaneda, 430 U.S. at 495;
Esquivel, 88 F.3d at 727.

The plaintiffs, however, then have the burden to demonstrate
that Hispanics were subject to "substantial underrepresentation"
over a significant period of time.  See id.; Ramseur v. Beyer,

1   983 F.2d 1215, 1230 (3d Cir. 1992).  This prong generally
2   requires statistical data that the jury pool does not adequately
3   represent the distinctive group in relation to the number of such
4   jury-eligible persons in the community.  See id. at 495-96.  The
5   Ninth Circuit has addressed identical statistical evidence in the
6   context of criminal defendants' challenges that the grand jury
7   did not constitute a fair-cross section of the community in
8   violation of their Sixth Amendment rights.  See United States v.
9   Torres-Hernandez, 447 F.3d 699, 703 (9th Cir. 2006); Esquivel, 88
10  F.3d at 726 (9th Cir. 1996); United States v. Sanchez-Lopez, 879
11  F.2d 541, 547 (9th Cir. 1989).  In analyzing this evidence, the
12  Ninth Circuit "favor[s] the 'absolute disparity' test for
13  measuring the representativeness of a distinctive group in a jury
14  pool."  Id.; Esquivel, 88 F.3d at 726; Sanchez-Lopez, 879 F.2d at
15  547.  The Ninth Circuit has also held that "[w]hen represented
16  with various types of data to determine whether Hispanics are
17  underrepresented on grand jury venires, a court must rely on the
18  statistical data that best approximates the percentage of jury-
19  eligible Hispanics in the district."  Id.

20      In this case, both plaintiffs and defendants have proffered
21  statistical evidence.  Plaintiffs present evidence that over the
22  last 10 years, there has been an absolute disparity of 6.5%
23  between the number of Hispanics in the grand jury pool and the
24  number of jury-eligible Hispanics in the community.  Defendants
25  present evidence that the absolute disparity over this period of
26  time is 4%.  The Ninth Circuit has held that a 7.7% absolute
27  disparity is considered "insubstantial" underrepresentation for
28  the purposes of a challenge to grand jury selection procedures

16

under the 5th and 6th Amendments.  <u>United States v. Suttiswad</u>,
696 F.2d 645, 649 (9th Cir. 1983); <u>see</u> <u>also</u> <u>Thomas v. Borg</u>, 159
F.3d 1147, 1151 (9th Cir. 1998) (collecting cases).  Even using
plaintiffs' evidence of a 6.5% absolute disparity over a ten year
period, plaintiffs have failed to set forth evidence sufficient
to meet the second prong of their prima facie case.

Plaintiffs assert that the court should not apply the Ninth
Circuit's holding in <u>Suttiswad</u>, that a 7.7% absolute disparity
does not establish a constitutional violation, to this case
because the <u>Suttiswad</u> court compared grand jury composition to
the *age-eligible* population data and in this case the court must
compare grand jury composition to the *jury-eligible* population
data.  Plaintiffs contend that the Ninth Circuit has not held
that a 7.7% absolute disparity is permissible when making an
analysis of jury-eligible population data.  Plaintiffs argue that
larger disparities are tolerated in cases that analyze general
population data or age-eligible population data because the
disparities necessarily included large groups of ineligible
persons.  Therefore, plaintiffs argue that these accepted larger
disparities should not be applied in cases that analyze jury-
eligible population data.

Plaintiffs have cited no case law to support their
proposition that absolute disparities previously found
constitutionally permissible should be applied differently based
upon the type of population data used in the analysis.  Nor has
the Ninth Circuit made such a distinction.  <u>See</u> <u>Esquivel</u>, 88 F.3d
at 727 (analyzing jury-eligible population data and citing the
<u>Suttiwad</u> court's acceptance of a 7.7% absolute disparity in

17

1   support of the court's holding); <u>see also</u> <u>United States v.</u>

2   <u>Rodriquez-Lara</u>, 421 F.3d 932, 943-44 (9th Cir. 2005) (discussing

3   absolute disparities previously found constitutionally

4   permissible and impermissible by the Ninth Circuit without noting

5   a distinction between general population data, age-eligible

6   population data, and jury-eligible population data).   However, in

7   order to avoid the potential for exaggeration through the

8   interpretation of statistics, the Ninth Circuit has "adopted a

9   test for substantiality which judges the effect of any deviation

10  not in terms of percentages, but in terms of its impact on the

11  absolute numerical composition of the grand jury. . . . That is,

12  to determine substantiality we look to people, not percentages."

13  <u>United States v. Kleifgen</u>, 557 F.2d 1293, 1297 (9th Cir. 1977);

14  <u>see</u> <u>United States v. Armstrong</u>, 621 F.2d 951, 955 (9th Cir.

15  1980).

16       Assuming *arguendo* that plaintiffs figures are accurate,

17  Hispanic individuals are underrepresented in an absolute sense by

18  6.5%.   Looking only at people, in an array of 100 jurors, the

19  absolute numerical effect of the underrepresentation of Hispanics

20  would be that the array would include 6.5 fewer Hispanics.   A

21  grand jury of 19 drawn from this array on the average would

22  underrepresent Hispanics by little more than one juror (1.235).

23  <u>See</u> <u>Kleifgen</u>, 557 F.2d at 1297.   This is not substantial

24  underrepresentation.   <u>See</u> <u>id.</u> (holding that underrepresentation

25  that amounts to approximately one juror on a grand jury panel of

26  23 is not substantial); <u>see also</u> <u>Suttiswad</u> (holding that

27  underrepresentation that amounts to almost 2 jurors on the grand

28  ///

jury panel (1.761) was similar to the underrepresentation in
Kleifgen and thus, insubstantial).

Plaintiffs also contend that the court should not look at
the disparity over the past ten years, but, rather, should
analyze the disparity over the past three years, which, according
to plaintiffs' expert, reflects a 13.5% absolute disparity.
Plaintiffs argue that the increase in absolute disparity
demonstrates a trend that the underrepresentation of Hispanics is
growing worse in recent years.  Defendants contend that
plaintiffs "arbitrarily select grand juror data for only the last
three years when a decade worth of data is available to slant
data to falsely suggest significant underrepresentation of
Hispanics on the grand jury."  (Defs.' Reply, filed Dec. 8, 2006,
at 6).  Defendants argue that not only is the 10 year period
relevant to the "significant period of time" requirement in
establishing a prima facie case, but that 10 years is also the
relevant time period because it is the approximate length of time
that the Superior Court's current recruitment and selection
process has been in place.  (Id. at 7).

The Equal Protection clause analysis requires evidence of
underrepresentation over a "*significant* period of time."
Castaneda, 430 U.S. at 494 (emphasis added).  The Ninth Circuit
has not specifically addressed the span of time necessary to
constitute a "significant" period.  But see United States v.
Quinones, 46 F.3d 1148, 1995 WL 29500, *10 (9th Cir. Jan. 25,
1995) (finding that evidence as to one year is insufficient to
satisfy the second prong of an equal protection challenge).
However, the Third Circuit has addressed this issue, and held

1    that studies conducted over a two year period were insufficient

2    to satisfy <u>Castaneda</u>'s requirement of "a significant period of

3    time." <u>Ramseur v. Beyer</u>, 983 F. 2d 1215, 1233 (3d. Cir. 1992).

4    The <u>Ramseur</u> court found that "those studies which have been found

5    to satisfy <u>Castaneda</u>'s requirement . . . have covered periods

6    substantially longer than the two years covered by this study."

7    <u>Id.</u> (citing <u>Hobby v. United States</u>, 468 U.S. 339, 341 (1984) (7

8    years); <u>Castaneda</u>, 430 U.S. at 487 (11 years); <u>Hernandez v.</u>

9    <u>Texas</u>, 347 U.S. 475, 481 (1954) (25 years)); <u>c.f.</u> <u>Enriquez v.</u>

10   <u>Procunier</u>, 752 F.2d 111, 115 (5th Cir. 1984) (3 years

11   insufficient). <u>But see</u> <u>United States v. Perez</u>, 672 F.2d 1380,

12   1387 (11th Cir. 1982) (criticized on other grounds by <u>Hobby v.</u>

13   <u>United States</u>, 468 U.S. 339 (1984)) (4 years).

14        Supreme Court precedent and cases addressing this issue in

15   other Circuits indicates that a "significant period of time" for

16   purposes of the <u>Castaneda</u> analysis means more than a handful of

17   years.  In this case, measurement over a ten year period is

18   particularly compelling because that is the approximate number of

19   years that the contested grand jury recruitment system has been

20   in place.  (Dep. of Robyn Weaver, Nov. 3, 2006, 55:4-12).

21   Therefore, the court finds that the underrepresentation of

22   Hispanic individuals on the Yolo County Grand Jury is

23   appropriately measured in this case over a ten year period.  As

24   such, for the reasons set forth above, plaintiffs fail to

25   demonstrate that Hispanics were subject to "substantial

26   underrepresentation" over a significant period of time.

27        In their reply, plaintiffs contend that the court should

28   consider plaintiffs' statistical evidence for disparities over

1   the last 4, 5, or 6 year period.  Accepting *arguendo* plaintiffs'
2   contention, plaintiffs have still failed to demonstrate absolute
3   disparities that demonstrate "substantial underrepresentation."
4   Plaintiffs present evidence that over the past 4 years, the
5   absolute disparity was 10.4%, over the past five years, the
6   absolute disparity was 8.3%, and over the past six years, the
7   absolute disparity was 8.6%.  In terms of people, in a panel of
8   19 grand jurors, Hispanics would be underrepresented by, at most,
9   approximately 2 jurors (1.976, 1.577, and 1.634, respectively).
10  Any disparity is similar to those previously approved by the
11  Ninth Circuit in <u>Suttiswad</u>, and thus, considered unsubstantial.
12  <u>See</u> <u>Suttiswad</u>, 696 F.2d at 649 (approving underrepresentation of
13  approximately two Spanish persons).

14      Nevertheless, plaintiffs' statistical evidence that
15  Hispanics have been underrepresented by an absolute disparity of
16  13.5% over the past three years is troubling to the court.
17  Unaddressed or ignored, this continuing disparity is likely to
18  provide future evidence of systemic underrepresentation of a
19  constitutional dimension.  However, a three year period is
20  insufficient to constitute a "significant period of time" for
21  purposes of the Equal Protection inquiry.  Further, the 13.5%
22  absolute disparity is less troubling when analyzing the trend
23  over the past three years.  Importantly, in the 2004-2005 term,
24  there were *zero* Hispanic individuals in the Yolo County Grand
25  Jury Pool and an absolute disparity of 16.5%, equal to the
26  percent of jury eligible population that is Hispanic.  (2d Am.
27  Weeks Decl., at 5).  This underrepresentation demonstrates a
28  clear problem.  In the 2005-2006 term, the absolute disparity was

14.6%, a statistic that is still troubling, but at least an increase in representation. (See id.)  Finally, in the 2006-2007 term, the absolute disparity was 8.4%, a marked increase in the representation of Hispanic individuals in the Grand Jury Pool. (Id.)

Plaintiffs argue that the increase in Hispanic representation in the 2006-2007 Grand Jury Pool is a result of manipulation by defendants motivated by the filing of this lawsuit.  However, there is no admissible evidence to support this argument, and it is unclear whether the applications were mailed to Hispanic individuals before or after this suit was filed.  Moreover, if the representation of Hispanic individuals on the Yolo County Grand Jury returns to the levels reached in 2004-2005 and 2005-2006, defendants will be laying the foundation for a future Equal Protection claim, where plaintiffs could make a showing of "substantial underrepresentation over a significant period of time."

At oral argument, plaintiffs cogently articulated for the first time their position that the court should not look systematically at the Castaneda three step analysis, but should take an "organic, wholistic look at the system."  In essence, plaintiffs ask the court to conflate the second and third step of the Castaneda analysis, to look at the procedures employed by defendants before analyzing the impact of these procedures upon the representation of Hispanics on the Yolo County Grand Jury. Plaintiffs rely primarily upon the Third Circuit's opinion in

///

///

22

1   <u>Ramseur</u> for this novel approach.[7]  In <u>Ramseur</u>, the court stated

2   that it was not fully collapsing the inquiries under the second

3   and third prongs of the <u>Castaneda</u> analysis, but that "it is

4   logical to view the presence of a non-random disparity as

5   establishing an 'underrepresentation,' while the disparity's

6   severity, underlying causes, and documentation would establish

7   whether it was 'substantial.'"  983 F.2d at 1232 n.13.[8]

8   Plaintiffs interpret <u>Ramseur</u> to support their position that the

9   court should examine the neutrality of the jury selection

10  procedures at the second step of the <u>Castaneda</u> analysis.  The

11  <u>Ramseur</u> court found that the underrepresentation of blacks in the

12  Essex County jury pools was not random based upon on the 14.1%

13  absolute disparity as well as a 28.9 standard deviation.  <u>Id.</u> at

14  1232.  The Third Circuit found that even with a 14.1% absolute

15  disparity, there was no constitutional violation because the

16  studies conducted covered only a two year period and because the

17

18      [7]   Plaintiffs also rely on the Supreme Court's statement
     in <u>Alexander v. Louisiana</u>, 405 U.S. 625, 630 (1972), that the
19   "Court has never announced mathematical standards for the
     demonstration of 'systemic' exclusion of blacks but has, rather,
20   emphasized that a factual inquiry is necessary in each case that
     takes into account all possible explanatory factors."  The court
21   agrees that an Equal Protection claim cannot be reduced into a
     simple mathematical formula.  Nor has the court applied such an
22   analysis to this case.  However, in <u>Castaneda</u>, decided five years
     after <u>Alexander</u>, the Supreme Court held that statistical evidence
23   of substantial underrepresentation over a significant period of
     time is required to set forth a prima facie Equal Protection
24   claim.  430 U.S. at 494.  In <u>Castaneda</u>, the Supreme Court also
     analyzed the degree of underrepresentation and found that it was
25   enough to establish a prima facie case of discrimination before
     analyzing the procedures challenged by the petitioner.  <u>Id.</u> at
26   495-96.

27      [8]   The Third Circuit cited no authority for its blended
     analysis of the second and third prongs of the <u>Castaneda</u>
28   analysis.

                                23

selection lists were facially neutral.  Therefore, the court held
that the appellant failed to present sufficient evidence to
fulfill the "substantial underrepresentation" requirement of
Castaneda, and did not address the third requirement of
discriminatory intent.  However, the Ramseur court only discussed
aspects of the selection process under the second prong after
finding non-random underrepresentation based upon the absolute
disparity of 14.1%.  In this case, the absolute disparity over
the relevant time period is 6.5%.  As such, unlike in Ramseur,
the statistical evidence does not establish non-random
underrepresentation.  Therefore, the Third Circuit's decision in
Ramseur does not offer a persuasive rationale for conflating the
second and third prong in this case because of the factual
dissimilarities.  Plaintiffs have failed to cite the court any
other authority which advocates such an approach to an Equal
Protection claim challenging underrepresentation of an
identifiable group on grand juries.

　　　　Further, while the Ninth Circuit has not squarely addressed
this argument, the manner in which the Ninth Circuit has
previously analyzed constitutional challenges to the
underrepresentation of cognizable groups on grand juries does not
support the approach advocated by plaintiffs.  The majority of
these cases arise in the criminal context, where the importance
of constitutional representation on a grand jury is arguable even
greater than in the civil context.  However, in such cases, the
Ninth Circuit has failed to discuss any aspects of the challenged
selection procedures where the defendant failed to present
sufficient statistical evidence or other data to establish

24

1  constitutionally impermissible underrepresentation.  <u>See e.g.</u>

2  <u>Torres-Hernandez</u>, 447 F.3d 699; <u>Suttiswad</u>, 696 F.2d 645;

3  <u>Armstrong</u>, 621 F.2d 951; <u>Kleifgen</u>, 557 F.2d 1293; <u>see also</u>

4  <u>Quadra</u>, 378 F. Supp. 605.  Such an approach is logical in the

5  present case because the harm sought to be addressed by plaintiff

6  is significant underrepresentation of Hispanics on the Yolo

7  County Grand Jury.  If the statistical evidence indicates that

8  there has not been constitutionally insufficient representation,

9  then there has been no such harm.

10      Finally, the Ninth Circuit has stated that "the most crucial

11  factor in an equal protection case is a showing of discriminatory

12  intent." <u>Esquivel</u>, 88 F.3d at 727.  In this case, there is no

13  direct evidence of discriminatory intent by defendants.  "If a

14  selection procedure is susceptible of abuse or is not racially

15  neutral, then that supports the presumption of discrimination

16  raised by the statistical showing." <u>Esquivel</u>, 88 F.3d at 727.

17  Plaintiffs present evidence to support their assertion that the

18  Yolo County Grand Jury recruitment and selection procedures are

19  susceptible to abuse.  However, because the statistical showing

20  does not demonstrate substantial underrepresentation over a

21  significant period of time, there is no presumption of

22  discriminatory intent that this evidence can support.

23      Therefore, because plaintiffs have failed to set forth

24  evidence supporting a prima facie case of an Equal Protection

25  ///

26  ///

27  ///

28  ///

1  violation, defendants' motion for summary judgment regarding

2  plaintiffs' Equal Protection claim is GRANTED.[9]

3  **C.   Due process claim**

4      Plaintiffs also assert that defendants have violated their

5  due process rights through the systemic exclusion of Hispanic

6  individuals from the Yolo County Grand Jury.  Plaintiffs argue

7  that, "analogous to the context of a criminal defendant

8  challenging a grand jury on the basis of due process, plaintiff

9  Serena was subject to investigation by a racially

10  underrepresentative grand jury." (Pls.' Opp'n, filed Dec. 1,

11  2006, at 14).

12      Lawsuits by persons claiming that they had been

13  unconstitutionally excluded from grand jury service are brought

14  under the Equal Protection Clause.  See Carter, 396 U.S. 320

15  (1970); Quadra, 378 F. Supp. 605.  Plaintiffs fail to cite to -

16  and the court has not found - any authority for the proposition

17  that some unspecified due process right is derived from

18  appearance before a civil grand jury.  Plaintiffs simply ask this

19  court to apply the test set forth by the Supreme Court in Duren

20  v. Missouri, 439 U.S. 357 (1979), to adjudicate plaintiffs' due

21  process claim.  However, the Duren test applies to a defendant's

22

23      [9]    Plaintiffs also present statistical evidence regarding
the representation of Hispanics who served as "holdovers" from a
prior grand jury.  However, plaintiffs allege an equal protection

24  violation based upon the composition of the grand jury.  The
representation of Hispanics in the subset of "holdover" grand

25  jurors is not relevant to this claim; only the total number of
Hispanics in the grand jury pool is relevant.  See Castaneda, 430

26  U.S. at 494 ("The degree of under representation must be proved,
by comparing the proportion of the group in the total population

27  *to the proportion called to serve as grand jurors*.") (emphasis
added).  Therefore, the court does not analyze plaintiffs'

28  statistics relative to this argument.

claim that he was denied his 6th Amendment right to a jury
selected from a fair cross-section of the community.  Id.  The
6th Amendment applies only to criminal proceedings.  U.S. Const.,
amend. VI.  This is not a criminal proceeding.

As such, without any legal support to do so, the court
declines to excise a free standing and unspecified due process
right separate and apart from plaintiffs' equal protection claim.
Therefore, defendants' motion for summary judgment regarding
plaintiffs' due process claim is GRANTED.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary
judgment is GRANTED.  The Clerk of the Court is directed to close
this file.

IT IS SO ORDERED.

DATED: January 9, 2007

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE